

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**05 CV 4886**

------------------------------------------------------------

CELLCOM TECH, INC.,

               Plaintiff,

   - against -

NEW CINGULAR WIRELESS SERVICES, INC.,
formerly known as AT&T Wireless Services, Inc.,

               Defendant.

------------------------------------------------------------x

No. 05 CIV _____ (___)

**NOTICE OF REMOVAL**



Defendant New Cingular Wireless Services, Inc. ("New Cingular Wireless"), by its undersigned attorneys, hereby removes the above-captioned action to this Court, pursuant to 28 U.S.C. §§ 1441 and 1446 on the following grounds:

      1.     A civil action was commenced and is now pending in the Supreme Court of the State of New York, County of Rockland, in which the above-captioned plaintiff and defendant are the named parties.  The action is styled Cellcom Tech, Inc. v. New Cingular Wireless Services, Inc., formerly known as AT&T Wireless Services, Inc.,  Index No. 05/3287 (the "State Action").

      2.     The State Action was commenced by Order To Show Cause together with an Affidavit of Meir Soilbelman, the Vice-President of Cellcom Tech, Inc., and a Memorandum of Law (all of which is annexed hereto as Exhibit A), which was first received by defendant by facsimile on May 18, 2005.  The Order to Show Cause, which was obtained *ex parte* and without notice to defendant, requests a Temporary Restraining Order and Preliminary Injunction preventing defendant from canceling its Reseller Agreement with plaintiff.  Indeed, the Order to Show Cause itself enjoins New Cingular Wireless from canceling that Agreement until further

377336.1

order of the Court.

       3.     As defendant first received the Order To Show Cause and accompanying papers on May 18, 2005, this Notice of Removal is being filed within thirty days after receipt by the defendant of the initial pleading setting forth the claim upon which the State Action is based, as required by 28 U.S.C. § 1446(b).

       4.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 exclusive of interest and costs and, to the best, current knowledge of counsel, the parties are of diverse citizenship.

       5.     As set forth above, plaintiff requests injunctive relief to prevent defendant from canceling the parties' Reseller Agreement. In the Second Circuit, the value of injunctive relief for purpose of satisfying the amount in controversy requirement of § 1332 is to be measured from the perspective of the plaintiff. *See, e.g., Doe v. CBS Broadcasting, Inc.*, No. 04 Civ. 312, 2004 WL 1586409, at *2 (S.D.N.Y July 15, 2004). Here, plaintiff claims that cancellation of the Reseller Agreement would allegedly "devastate Cellcom's business" and leave it with "no choice but to go out off [sic] business." (Affidavit of Meir Soilbelman dated May 16, 2005 at pp. 8, 9.) Mr. Soilbelman also alleges that Cellcom has invested "over two million dollars" in its relationship with New Cingular Wireless. (*See id.* at p. 7.) These allegations make plain that the value of the requested injunction to Cellcom is greater than $75,000, and thus that this action meets the amount in controversy prerequisite of 28 U.S.C. § 1332.

       6.     In addition, the citizenship of the parties is completely diverse. Defendant New Cingular Wireless is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the State of Georgia. To the best knowledge of

377336.1                                        2

counsel, Cellcom Tech, Inc. is a corporation organized and existing under the laws of the State of New York, with its principal place of business in State of New York.

7.      Accordingly, complete diversity exists for purposes of 28 U.S.C. § 1332 and this action is properly removable to this Court based upon complete diversity of citizenship.

8.      Written notice of this Notice of Removal shall promptly be given to plaintiff and shall be filed, along with a copy of the Notice of Removal, with the Clerk of the Supreme Court of the State of New York, County of Rockland, as required by 28 U.S.C. § 1446(d).

WHEREFORE, defendant prays that the above-captioned action be removed, without waiver of procedural or substantive defenses, from the Supreme Court of the State of New York, County of Rockland, to the United States District Court for the Southern District of New York.

Dated: New York, New York
       May 20, 2005

                              FRIEDMAN KAPLAN SEILER &
                              ADELMAN LLP


                              By:_____
                                 Robert D. Kaplan (RK 3627)
                                 Hallie B. Levin (HL 1628)
                                 1633 Broadway
                                 New York, New York 10019
                                 Tel: (212) 833-1100
                                 Fax: (212) 833-1250

                              *Attorneys for Defendant New Cingular Wireless Services, Inc.*

377336.1                              3

TO:

Law Offices of Bruce W. Minsky, P.C.
Bruce Minsky, Esq.
112 Brick Church Road
New Hempstead, New York  10977
Tel: (212) 956-3123; (646) 234-7006
Fax: (702) 973-6607

*Attorney for Cellcom Tech, Inc.*

Exhibit A

404-736-6064

At a Term, Part _____ , of the
Supreme Court, held in
and for the County of Rockland
at the County Courthouse,
1 S. Main Street, New City,
New York, on the 18th day of
May , 2005

### HON. ALFRED J. WEINER
### J.S.C.

Present: Hon. _____ , Justice

TRO / STAY

Doc ID:  018031880000 Type: COU
Recorded: 05/17/2005
Fee Amt: $305.00 Page 1 of 0
Rockland, NY
Ed Gorman County Clerk

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

---------------------------------------------------x SU-2005-003287

CELLCOM TECH, INC.,

                                Plaintiff,          ORDER TO SHOW
                                                    CAUSE
        -against-

NEW CINGULAR WIRELESS SERVICES, INC.,              Index No. 3287-05
formerly known as AT&T Wireless Services, Inc.,

                                Defendants.
---------------------------------------------------x

On reading and filing the affidavit of Meir Soilbelman, dated May 16,

2005, the Memorandum of Law, dated May 16, 2005, together with all of the

exhibits annexed hereto;

LET the Defendant NEW CINGULAR WIRELESS SERVICES, INC.,

formerly known as  AT&T Wireless Services, Inc.,  or their attorneys, show

cause before this Court, at a Term, IAS Part ____ , Room ____ , thereof, to be

held in and for the County of Rockland, at the Courthouse, 1 South Main Street,

New City, New York, on the 27th day of May, 2005, at 9:30 o'clock in the

1

05/18/2005 13:57     8456386406          LAWOFFICES                    PAGE 03/19

forenoon of that day, or as soon thereafter as counsel can be heard, why an Order should not be made herein temporarily restraining the defendant NEW CINGULAR WIRELESS SERVICES, INC. from terminating/canceling the 'Reseller Agreement', dated February 26, 2003, as between CELLCOM TECH, INC. and AT&T Wireless Services, Inc., or in the alternative, to the extent that NEW CINGULAR WIRELESS SERVICES, INC. has terminated and/or reduced CELLCOM TECH, INC.'s available services as pursuant to the 'Reseller Agreement' prior to the execution and/or service of an Order granted herein, then requiring NEW CINGULAR WIRELESS SERVICES, INC. to restore and maintain such service until a further Order by this respective Court, and for such other and further relief as to the Court may seem just and proper.

And sufficient cause having been shown let service of a copy of this Order and the papers upon which it is granted, upon the defendant NEW CINGULAR WIRELESS SERVICES, INC., via overnight mail, at their offices at 4513 Western Avenue, Lisle, IL 60532, Attn.: Ric Murray, Vice-President of Resale Operations and facsimile to (404) 236-6383, Attn.: Ric Murray, Vice-President of Resale Operations, on or before the 18th day of May, 2005, be deemed good and sufficient service,

And it is hereby ORDERED that all action and efforts on the part of the Defendant NEW CINGULAR WIRELESS SERVICES, INC., their agents and employees, which seek to terminate the 'Reseller Agreement be hereby stayed pending a determination of this motion, or, in the alternative to the extent that the defendant NEW CINGULAR WIRELESS SERVICES, INC. has terminated

2

and/or reduced CELLCOM TECH, INC.'s available services as pursuant to the 'Reseller Agreement' prior to the execution and/or service of an Order granted herein, then requiring NEW CINGULAR WIRELESS SERVICES, INC. to restore and maintain such service until a further Order by this respective Court .

E N T E R :

J.S.C.

**HON. ALFRED J. WEINER**
**J.S.C.**

3

05/18/2005  15:42    8456366466          LAWOFFICES                        PAGE  02/22

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
------------------------------------------------------------------X

CELLCOM TECH, INC.,

                                              Plaintiff,        AFFIDAVIT IN
                                                               SUPPORT

        -against-
                                                               Index No.
NEW CINGULAR  WIRELESS SERVICES, INC.,
formerly known as *AT&T Wireless Services, Inc.*,

                                              Defendants.
------------------------------------------------------------------X

**MEIR SOILBELMAN,** hereby affirms under the penalty of perjury:

1.      That I am the Vice-President of the Plaintiff CELLCOM TECH, INC.
("CELLCOM"), and, as such, am familiar with the facts referenced herein.  This
affidavit, as well as the Memorandum of Law, attached hereto as Exhibit "A", is
submitted in support of the instant Order to Show Cause on behalf of CELLCOM
seeking to restrain  the Defendant NEW CINGULAR WIRELESS SERVICES,
INC. formerly known as AT&T Wireless Services, Inc. ("CINGULAR") from
unilaterally and prematurely, without justification, terminating the 'Reseller
Agreement', dated February 26, 2003, as between CELLCOM and *AT&T
Wireless Services, Inc.* ("Reseller Agreement"), or, in the alternative to the
extent that the defendant NEW CINGULAR WIRELESS SERVICES, INC. has
terminated and/or reduced CELLCOM TECH, INC.'s available services as
pursuant to the 'Reseller Agreement' prior to the execution and/or service of an
Order granted herein, then requiring NEW CINGULAR WIRELESS SERVICES,

4

03/18/2005  15:42    8456386466         LAWOFFICES                    PAGE  03/22

INC. to restore and maintain such service until a further Order by this respective Court, along with such further and other relief as this Court may deem just and proper.

2.     For background purposes, CELLCOM is a distributor of certain prepaid cell phones and corresponding pre-paid cell phone plans.  In accordance with such business, CELLCOM entered into a Reseller Agreement with CINGULAR, dated February 26, 2003, a copy of which is attached hereto as Exhibit "B", whereby CELLCOM agreed to purchase from CINGULAR, and CINGULAR agreed to provide to CELLCOM, certain voice and data products and/or services which allow for wireless cell phone activations and usage by third-party end users ("Service(s)").  It was expected, and did  in fact occur that CELLCOM solicited and sold the Services to third-party distributors, retailers and end-using consumers ("Customer(s)").   Presently CELLCOM has over 35,000 active end-using customers who have previously paid for their cell phone and use of Services for which they rely.

As a side note, CELLCOM has no other provider for wireless service access for its end-using consumers other than CINGULAR.   In this light, the monies earned from the Reseller Agreement represents the plenary stream of income/revenue that is generated from CELLCOM's business operations.

3.     On  or  about  late  January  2005,  due  to  some  internal circumstances,  the  management  of  CELLCOM  was  assumed  by  a  new

5

management.  Within days of the assumption, CELLCOM was contacted by CINGULAR due to the non-payment of certain outstanding invoices.  Undertaking the necessary review of the available information provided by CINGULAR , along with my many discussions with CINGULAR, it was agreed to firm the outstanding balance and provide a workable payment schedule for the same.  These agreed matters were memorialized in a settlement Letter Agreement, dated February 2, 2005, the agreement attached hereto as Exhibit "C" ("Letter Agreement").

In accordance with the Letter Agreement, the outstanding balance as of December 31, 2004 was $524,115.60.  Further, as obligated, CELLCOM, within the strict confines of the agreed payment schedule, tendered an initial $100,000.00 in February, 2005, as well as the following March, 2005 payment of $53,014.05 and April, 2005 payment of $53,014.05.

4.     Sometime in late April, 2005 CINGULAR contacted the CELLCOM and relayed that CELLCOM owed additional monies for the month of December, 2004 ("Disputed Invoice").  Of course, CELLCOM objected since the Letter Agreement firmed an outstanding balance through December 31, 2004, a balance that was coordinated with previously reviewed billings/invoices forwarded by CINGULAR.

Ignoring the Letter Agreement, CINGULAR  thereafter demanded immediate payment of the Disputed Invoice and threatened to terminate and/or cancel CELLCOM's use of the Services, regardless if CELLCOM kept current with the undisputed payment obligations as required under the Letter Agreement

6

05/18/2005   15:42      8456386406                 LAWOFFICES                            PAGE 05/22

and Reseller Agreement.  Such a termination and/or cancellation would also terminate and/or cancel the Customer's usage as well.

Despite some frantic negotiations whereby CELLCOM agreed, as in accordance with Section 17 of the Reseller Agreement, to submit the Disputed Invoice to the contractually obligated 'alternative dispute resolution' and attempted to pursue the placement of the monthly settlement payments in escrow, CINGULAR has now demanded payment of the disputed amount, with a threat to send a forty-eight hour cancellation notice within the next few days.  As of the execution of this Affidavit, CELLCOM has learned that CINGULAR has prepared and mailed the cancellation notice. A copy will be forwarded to the Court upon receipt.

5.    At all times herein mentioned CELLCOM has performed its obligations as pursuant to the controlling Reseller Agreement and Letter Agreement. Additionally, CELLCOM has invested much time and effort, as well as over two million dollars, in the CINGULAR relationship whereby CELLCOM has used CINGULAR as its sole supplier of wireless voice and data activations and access to its Customers.  Given such compliance and reliance, it is astonishing that CINGULAR  would unilaterally and without cause, seek to terminate CELLCOM's use of the Services, a termination which would deny its Customers' use to a product/service they previously purchased.  This Court should note that a large part of CELLCOM's end-user customer base utilize their cell phones in lieu of the stationary land-lines. A termination of their cell phone

7

service would leave them with <u>no phone access for usual or emergency calls</u> (emphasis added).

CELLCOM would also suffer a major calamity.  The revenue that CELLCOM derives from the Reseller Agreement represents all of CELLCOM's operational revenue.  Without its source of revenue, and without the ability to engage a substitute supplier of services, CELLCOM, unable to pay its employees, trade debt, rent, tax and regulatory obligations, operational maintenance and suppliers, et. al., would have no choice but to go out off business.  The default in payments and/or services to our employees, suppliers, creditors and customers would negate our goodwill which has been built for years due to our good effort, good results and long standing relationships.  Such harms are irrevocable with little hope of repair.  As such, the unilateral termination and cancellation of the Reseller Agreement by CINGULAR, without justification, would be devastating.

The only way to prevent this inevitable harm is to apply a temporary restraining order and/or preliminary injunction which would either restrain CINGULAR from terminating the Reseller Agreement pending a determination of this motion, or, in the alternative to the extent that the CINGULAR has terminated and/or reduced CELLCOM TECH. INC.'s available services as pursuant to the Reseller Agreement prior to the execution and/or service of an Order granted herein, then requiring CINGULAR  to restore and maintain such service until a further Order by this respective Court a hearing scheduled.

8

6.    This Court should note that the threat of unilateral termination by CINGULAR is not contractually derived and would be defined as a breach of the Reseller Agreement.   CINGULAR  actions in breach should not cause a devastating and irrevocable harm to  CELLCOM who is a non-breaching party. The net effect would cause an unreasonably inequitable predicament, one for which Cellcom, an innocent party, as well as its customers totaling over 35,000.

7.    Any restraint on CINGULAR  ability to terminate/cancel the Reseller Agreement would not produce a negative effect in any regard.  On the other hand, an affecting termination/cancellation would, as mentioned before, devastate Cellcom's business.  Clearly the balance of equities fall in favor of Cellcom.

8.    The Court should rely upon the Memorandum of Law, attached hereto as Exhibit A, which Memorandum correctly discusses the legal standard and corresponding factual application, for the granting of a temporary restraining order and/or preliminary injunction.

9.    Lastly, this action is commenced by the instant Order to Show Cause rather the service of a Summons and Complaint since without an actual breaching termination and/or cancellation by CINGULAR , although the breaching termination and/or cancellation is imminently expected within the next few days, there is not an existing viable breach which would necessitate the related cause(s) of action.

9

10.   No previous application for relief herein prayed for has been made.


**WHEREFORE**, it is respectfully requested that this Court grant instant Order to Show Cause on behalf of CELLCOM TECH, INC.   by restraining the Defendant NEW CINGULAR WIRELESS SERVICES, INC. formerly known as AT&T Wireless Services, Inc. ("CINGULAR ") from unilaterally and prematurely, with justification, terminating the 'Reseller Agreement', dated February 26, 2003, as between CELLCOM and *AT&T Wireless Services, Inc.* ("Reseller Agreement"), or, in the alternative to the extent that the defendant NEW CINGULAR WIRELESS SERVICES, INC. has terminated and/or reduced CELLCOM TECH, INC.'s available services as pursuant to the 'Reseller Agreement' prior to the execution and/or service of an Order granted herein, then requiring NEW CINGULAR WIRELESS SERVICES, INC. to restore and maintain such service until a further Order by this respective Court, along with such further and other relief as this Court may deem just and proper.


*[Signature(s)/execution(s) on following page]*


10

Dated:     Brooklyn, New York
           May 16, 2005

                              MEIR SOIBELMAN

Sworn to me before this
16th day of May, 2005

Notary Public

BRUCE MINSKY
NOTARY PUBLIC STATE OF NEW YORK
NO. 02MI6063655
QUALIFIED IN ROCKLAND COUNTY
COMMISSION EXPIRES SEPTEMBER 4, July

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
-------------------------------------------------------------X
CELLCOM TECH, INC.,

                                    Plaintiff,

        -against-                                                Index No.
                                                                 [To Be Assigned]
NEW CINGULAR WIRELESS SERVICES, INC.,
formerly known as *AT&T Wireless Services, Inc.*,

                                    Defendants.
-------------------------------------------------------------X


**MEMORANDUM OF LAW ON BEHALF OF THE PLAINTIFF CELLCOM TECH, INC. IN SUPPORT OF THE PLAINTIFF'S ORDER TO SHOW CAUSE SEEKING A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**


LAW OFFICES OF BRUCE W. MINSKY, P.C.
Attorneys for the Plaintiff CELLCOM TECH, INC.
112 Brick Church Road
New Hempstead, New York 10977
(646) 234-7006

1

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted on behalf of the Plaintiff Cellcom Tech, Inc. ("Cellcom") in support it's Order to Show Cause which seeks a Temporary Restraining Order and Preliminary Injunction ("TRO") against the defendant New Cingular Wireless Services, Inc. formerly known as *AT&T Wireless Services, Inc.* ("Cingular"). Cellcom seeks such TRO to prevent Cingular from unilaterally, and without cause, terminating a Reseller Agreement dated February 26, 2003 as between Cellcom and AT&T Wireless Services, Inc. ("Reseller Agreement") or, in the alternative, to the extent that Cingular has terminated and/or reduced Cellcom's available services as pursuant to the Reseller Agreement prior to the execution and/or service of an Order granted herein, requiring Cingular to restore and maintain such service until a further Order by this respective Court.

## STATEMENT OF FACTS

The facts in support of Cellcom's position are more fully set forth in the affidavit/affirmation of Meir Soilbelman , dated May 16, 2005, as well as the exhibits attached thereto ("Soilbelman Affidavit ").

2

## SUMMARY OF ARGUMENTS

The Plaintiff Cellcom should be granted a TRO enjoining Cingular from terminating the Reseller Agreement as:

(i)     Cellcom will be irreparably harmed by Cingular's unilateral termination of the services since Cellcom will be unable to fulfill its obligations to distributors, retailers and end-users ("Customers") and Cellcom's reputation as a wholesale and retail reseller of wireless voice and data telephone service/Services ("Service(s)") will be irreparably damaged;

(ii)     Money damages will be inadequate since Cellcom cannot be compensated for the possible cessation of their business activities;

(iii)     If Cingular does unilaterally, and without cause, terminate the Reseller Agreement Cellcom is likely to succeed in their then reciprocating action for breach(es) of Cingular's obligations as under the Reseller Agreement since:

(a)     The Reseller Agreement does not allow for a unilateral termination by either party; and;

(b)     Cellcom disputes the recent Cingular computation of alleged overdue charges; and,

(iv)     In light of the above, the 'balance of the equities' tip decidedly in favor of granting the requested TRO since Cellcom's businesses will be

3

significantly and irrevocably threatened and Cingular will continue to be paid as in accordance with the Reseller Agreement.

**POINT I**

<u>PLAINTIFF IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION</u>

Pursuant to <u>CPLR Section 6301</u>, a court may grant a preliminary injunction "in any action where it appears that the defendant threatens or is about to do, or is doing or procuring or suffering to be done, an act in violation of the plaintiff's rights respecting the subject of the action[.]"  In order to obtain a preliminary injunction, "the movant must demonstrate a likelihood of success on the merits, irreparable injury in the absence of injunctive relief, and the equities of the situation are in their favor." <u>Borenstein v. Rochel Properties Inc., 176 A.D.2d 171, 574 N.Y.S.2d 192 (1st Dep't 1991); W.T. Grant Co v. Srogi, 52 N.Y.2d 496, 438 N.Y.S.2d 761 (1981);</u> After <u>Six, Inc. v. 201 East 66th Street Associates, 87 A.D.2d 153, 450 N.Y.S.2d 793 (1st Dep't 1982),</u> appeal dismissed, <u>57 N.Y.2d 835, 455 N.Y.S.2d 786 (1982).</u> See also, <u>Aetna Ins. Co. v. Capasso,</u> 75 N.Y.2d 860, 862, 522 N.Y.S.2d 918, 919 (1990); <u>Doe v. Axelrod, 73 N.Y.2d 748, 750, 536 N.Y.S.2d 44, 45 (1988); Scotto v. Mei, 219 A.D.2d 181, 182, 642 N.Y.S.2d 863, 864 (1st Dept. 1996).</u>  Additionally, under <u>CPLR Section 6313(a),</u> if, on a motion for a preliminary injunction, the plaintiff shall show that immediate and irreparable injury, loss or damages will result unless the defendant is restrained before a hearing can be had, a temporary restraining order may be granted without notice.

4

The chief function of a preliminary injunction is to prevent any conduct before judgment, which-may-impair the ability of the court to render an appropriate final judgment. Mucchi v. Eli Haddad Corp., 101 A.D.2d 724, 725, 475 N.Y.S.2d 35, 36 (1st Dept. 1984). Once plaintiff has established a prima facie right to the ultimate relief sought, the court's determination as to the propriety of granting and injunction should give greater weight and consideration to the danger threatened than to questions concerned with the probability of plaintiff proving its case. Bisca v. Bisca, 437 N.Y.S.2d 258, 261-62, 108 Misc.2d 227 (1981). Stated otherwise, where the denial of injunctive relief would render a final judgment ineffectual, the degree of proof required to establish the element of likelihood of success on the merits should be reduced. State v. City of New York, 275 A.D.2d 740, 741, 713 N.Y.S.2d 360, 361 (2nd Dept. 2000). The mere fact that there may be questions of fact for trial does not preclude granting a preliminary injunction. Egan v. New York Care Ins. Co., Inc., 266 A.D.2d 600, 601, 697 N.Y.S.2d 776, 777 (3rd Dept. 1999).

Lastly, while the remedy of a preliminary injunction should be used sparingly, the granting of such is within the sound discretion of the court and should be utilized to preserve the status quo pending resolution of the underlying dispute. Hoppman v. Riverview Equities Corp., 16 A.D.2d 631, 226 N.Y.S.2d 805, 860 (1st Dep't 1962).

1.  _Plaintiffs Will Suffer Irreparable Harm_

It is well established that the right to carry on a lawful business without obstruction is a property right, and acts committed without just cause or excuse

5

which interfere with the carrying on of plaintiffs business ... do an irreparable injury and thus authorize the use of an injunction." Tappan Motors, Inc. v. Waterbury, 318 N.Y.S.2d 125, 126, 65 Misc.2d 514 (NY Sup. Ct. 1971); David Harp Restaurant Management v. Cromwell, 183 A.D.2d 423, 586 N.Y.S.2d 210 (1st Dept. 1992). Thus, where such devastation to a plaintiff's business is threatened by the actions of a defendant, irreparable harm is deemed established, and a plaintiff will be entitled to a preliminary injunction to prevent such destruction. See Latrieste Restaurant and Cabaret, Inc. v. Village of Port Chester, 212 A.D.2d 668, 669, 622 N.Y.S.2d 765, 766 (2d Dept, 1995)

As discussed in the Soilbelman Affidavit, the actions of Cingular at issue herein, in it's threatened unilateral termination of the Reseller Agreement, will have the inevitable effect of halting Cellcom's source of revenue, the lifeblood of its operation. This revenue is vital to Cellcom's continued existence by supporting its employee salaries, suppliers, operational maintenance and support, tax and regulatory obligations as well as other innumerable and necessary costs/expenses. Additionally, Cellcom's Customers will no longer have use of the Services for which they have previously paid and relied. Furthermore, since Cellcom is a well-known industry reseller of the Services, any partial/permanent disruption in being able to provide the Services or ensure their viability Services to its Customers will have a devastating impact on their ability to present themselves as continuing and future reliable resellers of the Services, the net result causing the inevitable irreparable harm. Such a plenary negative impact on Cellcom's reputation, credibility and goodwill, the sum of which has been built, cultivated and

6

enjoyed at much cost, time and successful efforts, would not survive the required repair. In this light, Cingular's threat of terminating the Reseller Agreement would cause a total destruction of Cellcom's enterprise and, as a result, rises to the level of imminent irreparable harm for the prevention of which Cellcom is entitled to injunctive relief.

2.    _Inadequacy of Money Damages Due to the Inability to Accurately Calculate Such Damages_

It is well-settled that "[i]rreparable injury, for purposes of equity, has been held to mean any injury for which money damages are insufficient." Fischer v. Deitsch 168 A.D.2d 599, 563 N.Y.S.2d 839 (2d Dep't 1990); People v. Anderson, et al., 529 N.Y.S.2d 917, 924, 137 A.D.2d 259 (4th Dep't 1988); Sirius Sattelite Radio, Inc. v. Chinatown Apartments, Inc., 2003 WL 1227617 (1st Dep't 2003).

As detailed in the Soilbelman Affidavit, to allow Cingular to unilaterally, and without cause, terminate the Reseller Agreement will permanently jeopardize the viability of Services previously purchased by Cellcom's Customers, and with no subsequent revenue stream, force an unreasonable halt to Cellcom's overall operations. Additionally, negating the expected on-going concern which historically has provide a needed revenue stream, along with the entire loss of investment and expected future income to investors, provide a precarious predicament to presently determine a valuation for damages. How can one calculate the destruction of a business to its owners and investors, as well as claims from retail and industry customers for unusable products and services previously purchased?

7

05/18/2005  15:42     8456386406          LAWOFFICES                    PAGE  18/22

3.    _Plaintiffs Have Established A Likelihood of Success on the Merits_

In addition to establishing that Cingular's termination of Reseller Agreement will cause Cellcom to suffer irreparable harm, Cellcom has also demonstrated, based on documentary evidence, that termination would be in violation of Reseller Agreement (See Soilbelman Affidavit). Thus, Cellcom has alleged facts which demonstrate that, although Cellcom was in compliance with their contractual obligations, and subsequently intended the same, Cingular threatened unilaterally, and without cause, to terminate the Reseller Agreement. As Cingular's breach of the Reseller Agreement is clear, Cellcom has established a likelihood of success on the merits. See McLaughlin Piven Vogel Inc. v. W.J. Nolan & Co., 114 A.D.2d 165, 498 N.Y.S.2d 146 (2d Dep't 1986) (to demonstrate a likelihood of success on the merits, "a prima facie showing of a right to relief is sufficient....").

4.    _The Equities Tip Decidedly in Plaintiffs' Favor_

The TRO is proper here because the balance of the equities strongly tip in favor of Cellcom.  As set forth above and in the accompanying Soilbelman Affidavit, if Cellcom is not granted injunctive relief preventing Cingular from breaching its contractual obligations and terminating the Reseller Agreement, Cellcom will lose its revenue stream as Cingular is the sole supplier of the services that Cellcom sells to its Customers with such derived income constituting a significant and irreplaceable portion of Cellcom's revenue stream. Without an immediate injunction directing Cingular not to terminate the Reseller Agreement, Cellcom's operation will be permanently and irrevocably halted/hampered, and its industry credibility devastated.  Conversely, Cingular will not suffer at all if

8

required to continue providing services to Cellcom and its Customers under the Reseller Agreement.   Any hardship to Cingular, at best, is a minimal inconvenience, though it is firmly alleged that Cingular is not due any additional funds for the periods in question. Any inconvenience derived therefrom is decidedly outweighed by the devastation of Cellcom's operation and credibility as a telephone product reseller.   As such, the balance of equities in this case tips decidedly in favor of Cellcom because Cingular will not suffer harm in any proportionate to Cellcom's loss of business and revenue as a result of seeking to maintain the status quo.

## CONCLUSION

Based on the foregoing, Cellcom respectfully request that this Court issue a temporary restraining order and preliminary injunction directing Cingular not to terminate Cellcom's available services set forth in the Reseller Agreement pending determination of this Action, or, in the alternative, to the extent that Cingular has terminated and/or reduced Cellcom's available services as pursuant to the Reseller Agreement prior to the execution and/or service of the Order granted herein, requiring Cingular to restore and maintain such service until a further Order by this respective Court, and for such other and further relief as to this Court seems just and proper

9

Dated:   New Hempstead, New York
         May 16, 2005


                       LAW OFFICES OF BRUCE W. MINSKY, P.C.

                       By:_____
                       Bruce W. Minsky, Esq.
                       Attorneys for the Plaintiff CELLCOM TECH, INC.
                       112 Brick Church Road
                       New Hempstead, New York 10977
                       (646) 234-7006

10

Dated:   New Hempstead, New York
        May 16, 2005


               LAW OFFICES OF BRUCE W. MINSKY, P.C.

               By:_____
               Bruce W. Minsky, Esq.
               Attorneys for the Plaintiff CELLCOM TECH, INC.
               112 Brick Church Road
               New Hempstead, New York 10977
               (646) 234-7006

10

# EXHIBIT B

# RESELLER AGREEMENT

**THIS RESELLER AGREEMENT**, effective as of _____ (the "Effective Date"), is between AT&T Wireless Services, Inc., a Delaware corporation, for itself, its Affiliates, and as agent for its operating subsidiaries ("AT&T"), and _____ Inc. ("Customer").

In consideration of the mutual promises in this Agreement, the parties hereby agree as follows:

**Section 1.**   **Purchase and Sale of the Service.** Customer agrees to purchase from AT&T, and AT&T agrees to sell to Customer, the following services for resale to third parties:

— Voice Service on AT&T's TDMA Digital Wireless Network (additional terms are set forth on Exhibit A).

— Data Service on AT&T's CDPD Wireless Network (additional terms are set forth on Exhibit B).

— Voice and Data Service on AT&T's GSM/GPRS Wireless Network (additional terms are set forth on Exhibit C).

— Data-Only Service on AT&T's GSM/GPRS Wireless Network (additional terms are set forth on Exhibit D).

— Prepaid Service (additional terms are set forth on Exhibit E).

**Section 2.**   **Term.** This Agreement commences on the Effective Date set forth above and remains in effect one year. This Agreement will automatically renew for successive one (1) year renewed terms unless a party provides the other party with a notice of termination at least ninety (90) days prior to the end of the then-current term.

**Section 3.**   **Definitions.**

3.1   **Affiliate(s)** means, with respect to any entity, any other entity that directly controls, is controlled by or is under common control with the first entity. Control is deemed to exist when an entity has the direct or indirect possession of the power to direct the management and policies of another entity.

3.2   **Area(s)** means the areas within the United States where AT&T is licensed to provide the Service and is providing Service. The Area changes from time to time.

3.3   **Device** means the equipment used by a Subscriber or an End User to originate or receive wireless transmissions on the Network, including any wireless telephone, wireless modem, wireless SIM (Subscriber Identity Module) Card, and any accessories.

1

CONFIDENTIAL

3.4    **End User** means an individual or entity obtaining access to Service from Customer.

3.5    **Equipment** means all equipment (other than equipment comprising portions of AT&T's network) necessary to enable Customer or its End Users to receive the Service, including but not limited to Customer's network facilities, and any End User Device.

3.6    **Events of Default** means the following:

(i)    the execution of any assignment for the benefit of creditors or the filing for relief by either party under any applicable bankruptcy, reorganization, moratorium, or similar debtor relief laws;

(ii)    the appointment of a receiver for Customer or AT&T or for substantially all of their respective assets or properties;

(iii)    the failure of either party to pay any sum owed to the other hereunder at the time such amount comes due;

(iv)    the failure of either party to perform or observe any other term, condition, or covenant to be performed by it under this Agreement;

(v)    the commission of any illegal act (excluding misdemeanor traffic offenses and other minor misdemeanors not involving dishonesty or moral turpitude) by or the filing of any criminal indictment or information against a party, its proprietors, partners, officers, directors or shareholders (to the extent such shareholders control in the aggregate or individual 10% or more of the voting rights or equity interests of such party);

(vi)    the furnishing, within a twelve (12)-month period, by Customer to AT&T of two or more checks that are not paid when presented due to insufficient funds;

(vii)    an unauthorized assignment of this Agreement; and

(viii)    the failure by Customer to meet the eligibility requirements or any of the terms and conditions of the Service Plans selected by Customer.

3.7    **Network** means those integrated mobile switching facilities, servers, cellsites, connections, billing systems and other related facilities used to provide Service in an Area.

3.8    **Number** means the telephone, data and/or messaging number(s) assigned to Customer for each End User to obtain access to Service, including without limitation the AT&T network equipment identifier ("NEI") and the mobile identification number ("MIN")

3.9    **Service** means the wireless telecommunications services selected in Section 1.

2

CONFIDENTIAL

3.10   **Service Plan** means the particular set of rates, terms and conditions at which AT&T makes Service available to Customer, but does not include any short-term marketing promotions that may come with the plan.

3.11   **Subscriber** means any person or entity purchasing Service from AT&T, including Customer. An End User is not a Subscriber.

3.12   **Subscription Fraud** means using or assisting another to use any scheme, false representation, or false credit device, or other fraudulent means or devices in connection with Service; including, but not limited to, the fraudulent production of information regarding a person's identity or the use of unauthorized credit.

3.13   **Unauthorized Access** means any unauthorized use of Service through the modification of the electronic serial number ("ESN") or other authentication method associated with a Device which shall include the practices generally referred to as "counterfeiting," "cloning fraud," or "tumbling fraud".

## Section 4.   The Service.

4.1   **Establishing an Account.** Customer shall provide information reasonably requested to establish a billing account in each metropolitan market selected by Customer. Once all requested information is received by AT&T, AT&T will use its best efforts to establish Customer's account(s) within thirty (30) days.

4.2   **Assigning Numbers.**

4.2.1   **Initial Assignment and Subsequent Orders.** Once a billing account is established, Customer shall accept an initial order of Numbers as required by AT&T. Customer may then order additional blocks of Numbers as needed. Subject to the availability of Numbers, the imposition of additional processes on AT&T by third parties in order to obtain the Numbers, and the capacity of the AT&T's facilities, such additional Numbers will be supplied to Customer under normal circumstances within three (3) business days after AT&T's receipt of the order. As a general rule, AT&T shall process orders for Numbers from all Subscribers, including Subscribers who are owned or controlled by AT&T or an Affiliate of AT&T, in the sequence in which orders for additional Numbers are received. If the order for Numbers pertains to a new market, a new billing account may need to be established before the Numbers can be provided. AT&T's obligation to provide additional Numbers to Customer shall cease upon (a) receipt by AT&T of Customer's notice of termination, or (b) issuance by AT&T of notice of termination or upon notice of default. If Customer cures the defaults described in the notice of default within the required period, then AT&T shall again be obligated to provide additional Numbers as provided in this section.

4.2.2   **Cancellation of Number Assignments.** Customer may cancel the assignment of any Number, provided that (i) the total amount of Numbers assigned to Customer shall not be less than the minimum amount AT&T may prescribe for resellers; and (ii) where

3

rev. 1/31/02

CONFIDENTIAL

applicable. Customer pays any cancellation fees associated with cancellation of Number assignments.

**4.2.3    Number Conservation.** Customer and AT&T shall follow reasonable number conservation policies generally accepted by the telecommunications industry and AT&T may, from time to time upon reasonable notice to Customer, change Number assignments in conformity with such policies, including changes requested or ordered by federal or state regulatory authorities or by number administrators recognized by such authorities as having responsibility for the assignment of telephone numbers. If Numbers are unavailable, AT&T may follow generally accepted industry standards and/or regulatory requirements, if any, in responding to the shortage of Numbers. AT&T shall incur no liability to Customer for Number shortages.

**4.2.4    Ownership of Numbers.** Customer acknowledges that, subject to FCC number portability rules, neither it nor any End User shall have or acquire any proprietary right in any specific Number or Number block provided by AT&T.

**4.3    Activation of Service.**

**4.3.1    Activation Requests.** AT&T shall use reasonable efforts to activate Numbers as soon as practicable (normally within four (4) business hours) following receipt by AT&T's designated representative of a completed activation form. AT&T shall not be obligated to activate Service for any Number assigned to Customer if Customer has committed an Event of Default which has not been cured within the applicable cure period described in Section 15.1.

**4.3.2    Remote Access.** AT&T will make reasonable efforts to allow Customer to perform activations and other account changes via remote access to AT&T's systems. The terms and conditions applicable to remote access will be as described in a separate agreement.

**4.3.2    Restrictions.** A Number may not be associated with more than one Device at the same time, unless approved in writing by AT&T. AT&T reserves the right to deny Service at the point of activation to Devices appearing on AT&T's service deny lists for one of a variety of reasons, including cases where the Device is stolen, has been used for fraudulent purposes, or is defective. AT&T is not liable to Customer or End Users if Service is denied, or a requested modification is not made to a Number appearing on the then-current service deny lists.

**4.4    Modification or Termination of Service.** Except as otherwise provided in a separate remote access agreement described in Section 4.3 above and subject to the limitations described in this Agreement, if Customer desires to modify or terminate Service with respect to one or more Number(s), Customer shall provide notice to AT&T of such modification or termination specifying the Number(s) and such additional information as AT&T may reasonably require. Such notice shall be provided by an authorized representative of Customer and shall be given during AT&T's business hours. AT&T shall modify or terminate Service to such Number(s) under normal circumstances within four (4) business hours following receipt of such notice from Customer. Notwithstanding the foregoing, AT&T may modify or terminate Service

4

with respect to one or more Number(s) as provided below in Section 9 with respect to abuse or fraudulent use. AT&T shall have the right to establish policies regarding the length of time between deactivating and reactivating the same Number.

**4.5    Troubleshooting.** AT&T will provide to Customer, and not directly to End Users, network monitoring, technical assistance and trouble-shooting support regarding the Service as AT&T deems reasonable from time to time. Customer will cooperate with AT&T in any troubleshooting of the Equipment or the Network as required to maintain the efficient operation of the Service.

**4.6    Limitations on Service.**

    4.6.1    **General Limitations.** CUSTOMER ACKNOWLEDGES THAT SERVICE IS MADE AVAILABLE ONLY WITHIN THE OPERATING RANGE OF THE NETWORK.  SERVICE MAY BE TEMPORARILY REFUSED, INTERRUPTED, OR LIMITED BECAUSE OF:  (a) FACILITIES LIMITATIONS; (b) TRANSMISSION LIMITATIONS CAUSED BY ATMOSPHERIC, TERRAIN, OTHER NATURAL OR ARTIFICIAL CONDITIONS ADVERSELY AFFECTING TRANSMISSION, AND OTHER CAUSES REASONABLY OUTSIDE OF AT&T'S CONTROL; OR (c) EQUIPMENT MODIFICATIONS, UPGRADES, RELOCATIONS, REPAIRS, AND OTHER SIMILAR ACTIVITIES NECESSARY FOR THE PROPER OR IMPROVED OPERATION OF SERVICE.  CONNECTIONS MAY BE "DROPPED" (I.E., INVOLUNTARILY DISCONNECTED) FOR A VARIETY OF REASONS, INCLUDING, WITHOUT LIMITATION, ATMOSPHERIC CONDITIONS, TOPOGRAPHY, WEAK BATTERIES, SYSTEM OVERCAPACITY, MOVEMENT OUTSIDE A SERVICE AREA OR GAPS IN COVERAGE WITHIN A SERVICE AREA.  AT&T SHALL INCUR NO LIABILITY FOR ITS INABILITY TO PROVIDE ADEQUATE SERVICES HEREUNDER IF SUCH INABILITY IS DUE TO THE ABOVE LIMITATIONS OR TO CAUSES BEYOND THE REASONABLE CONTROL OF AT&T, NOR SHALL AT&T BE RESPONSIBLE FOR ANY ACT OR OMISSION RELATED TO NON-AT&T EQUIPMENT OR SYSTEMS USED IN CONNECTION WITH THE SERVICE.

    4.6.2    **Limitations on Roaming Service.** AT&T WILL PROVIDE THE SAME ACCESS TO ROAMING CAPABILITIES (INCLUDING "IN-AREA" ROAMING WHERE AVAILABLE) THAT IS MADE AVAILABLE BY AT&T TO OTHER SIMILARLY SITUATED SUBSCRIBERS PROVIDED THAT EQUIPMENT WITH SIMILAR TECHNICAL CAPABILITIES AND PROGRAMMING IS USED BY END USERS.  THE AVAILABILITY OF ROAMING SERVICES, AND THE CHARGES FOR THOSE SERVICES, IS DEPENDENT IN PART ON THE TYPE OF EQUIPMENT USED BY END USERS AND THE PROGRAMMING OF THAT EQUIPMENT. AT&T MAKES NO WARRANTIES OR REPRESENTATIONS AS TO THE AVAILABILITY OR QUALITY OF ROAMING SERVICE PROVIDED BY OTHER WIRELESS CARRIERS, AND AT&T SHALL HAVE NO LIABILITY WHATSOEVER FOR ANY ERRORS, OUTAGES, OR FAILURES OF ROAMING SERVICES PROVIDED BY OTHER WIRELESS CARRIERS.

5

rev. 1/1/02

CONFIDENTIAL

IF AT&T, OR ANOTHER ENTITY WITH WHOM AT&T HAS A ROAMING AGREEMENT, DISCOVERS OR SUSPECTS ABUSE OR FRAUDULENT WITH RESPECT TO CERTAIN NUMBERS, THEN ROAMING PRIVILEGES MAY BE SUSPENDED WITH RESPECT TO SUCH NUMBERS, AT&T SHALL USE COMMERCIALLY REASONABLE EFFORTS TO PROVIDE CUSTOMER WITH PRIOR, OR PROMPT SUBSEQUENT, NOTIFICATION OF THE SUSPENSION OF THE ROAMING SERVICE. AT&T SHALL HAVE NO LIABILITY TO CUSTOMER REGARDING THE UNAVAILABILITY OR SUSPENSION OF ROAMING SERVICE BY OTHER CARRIERS.

TO THE EXTENT ACCESS TO ROAMING CAPABILITIES IS PROVIDED BY AT&T TO CUSTOMER, IT SHALL BE DEEMED TO BE A "SERVICE" AS DEFINED IN SECTION 3 ABOVE, AND THE USE OF SUCH ROAMING BY CUSTOMER OR CUSTOMER END USERS SHALL BE GOVERNED BY THE PROVISIONS OF THIS AGREEMENT.

**4.6.3   Privacy.** THE NETWORK HAS MANY COMPLEX ELEMENTS AND IS NOT GUARANTEED AGAINST EAVESDROPPERS OR INTERCEPTORS. CUSTOMER AGREES THAT AT&T SHALL NOT BE LIABLE TO CUSTOMER OR TO END USERS FOR ANY LACK OF PRIVACY OR SECURITY.

**4.7   Relationship with End Users**

**4.7.1   Generally.** AT&T is obligated only to Customer and not to End Users, who are not to be deemed third-party beneficiaries of this Agreement. Customer is solely responsible for all risks and expenses incurred with its provision of the Service to End Users. Customer will act on its own account in all respects and will be solely responsible for such things as credit verification, deposits, billing, collection, and bad debt.

**4.7.2   Disclosures to End Users.** Customer will disclose to End Users the following provisions:

1.   [END USER] HAS NO CONTRACTUAL RELATIONSHIP WITH THE UNDERLYING WIRELESS SERVICE CARRIER AND [END USER] IS NOT A THIRD PARTY BENEFICIARY OF ANY AGREEMENT BETWEEN [CUSTOMER] AND UNDERLYING CARRIER.  [END USER] UNDERSTANDS AND AGREES THAT THE UNDERLYING CARRIER SHALL HAVE NO LEGAL, EQUITABLE, OR OTHER LIABILITY OF ANY KIND TO [END USER].  IN ANY EVENT, REGARDLESS OF THE FORM OF THE ACTION, WHETHER FOR BREACH OF CONTRACT, WARRANTY, NEGLIGENCE, STRICT LIABILITY IN TORT OR OTHERWISE, [END USER's] EXCLUSIVE REMEDY FOR CLAIMS ARISING IN ANY WAY IN CONNECTION WITH THIS AGREEMENT, FOR ANY CAUSE WHATSOEVER, INCLUDING BUT NOT LIMITED TO ANY FAILURE OR DISRUPTION OF SERVICE PROVIDED HEREUNDER, IS LIMITED TO PAYMENT OF DAMAGES IN AN AMOUNT NOT TO EXCEED THE AMOUNT PAID BY [END USER] FOR THE SERVICES DURING THE TWO (2) MONTH PERIOD PRECEDING THE DATE THE CLAIM AROSE.

6

2.   [END USER] SHALL INDEMNIFY AND HOLD HARMLESS THE UNDERLYING WIRELESS SERVICE CARRIER AND ITS OFFICERS, EMPLOYEES, AND AGENTS AGAINST ANY AND ALL CLAIMS, INCLUDING WITHOUT LIMITATION CLAIMS FOR LIBEL, SLANDER, OR ANY PROPERTY DAMAGE, PERSONAL INJURY OR DEATH, ARISING IN ANY WAY, DIRECTLY OR INDIRECTLY, IN CONNECTION WITH THIS AGREEMENT OR THE USE, FAILURE TO USE, OR INABILITY TO USE THE NUMBER EXCEPT WHERE THE CLAIMS RESULT FROM THE UNDERLYING CARRIER'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.  THIS INDEMNITY SHALL SURVIVE THE TERMINATION OF THE AGREEMENT.

3.   [END USER] HAS NO PROPERTY RIGHT IN ANY NUMBER ASSIGNED TO IT, AND UNDERSTANDS THAT ANY SUCH NUMBER CAN BE CHANGED FROM TIME TO TIME.

4.   [END USER] UNDERSTANDS THAT [CUSTOMER] AND THE UNDERLYING CARRIER CANNOT GUARANTY THE SECURITY OF WIRELESS TRANSMISSIONS, AND WILL NOT BE LIABLE FOR ANY LACK OF SECURITY RELATING TO THE USE OF THE SERVICES.

**4.7.3   End User Support.**  Customer is solely responsible for all interactions with End Users with respect to the Service.  This includes, but is not limited to, taking the End Users' calls and using reasonable commercial efforts to remedy any problem without AT&T's participation.  Customer will report a problem to AT&T only upon reasonable verification that the problem is due to reasons other than misuse, malfunction or the failure of the Equipment to meet the technical standards for compatibility with the Service, or failure of the End User to understand how to use the Service.

**4.7.4   End User Communications.**  AT&T will have the continuing right to market and sell the Service and any other communications services to any third party, including but not limited to current, future and potential End Users, and to communicate with such third parties, including but not limited to with respect to Customer's performance hereunder.

**4.8   Additional Procedures.**  In addition to complying with the requirements of this Agreement, Customer will comply with such other policies and procedures reasonably established by AT&T for obtaining Numbers, configuring and programming Equipment, activating or deactivating Service with respect to any End User, and other activities contemplated by this Agreement.  AT&T may from time to time modify these policies and procedures by giving Customer notice.

**4.9   Authorized Representatives.**  AT&T and Customer shall each notify the other of their respective authorized representatives for purposes of giving and receiving the notices for any Service orders, including those which involve the activation, change, or discontinuance of Service.  Each party may appoint no more than three (3) representatives at any time, unless the other party consents to a greater number, which consent will not be unreasonably withheld.  The notice of appointment, and the authority of the representative, shall remain effective until the

7

notice is canceled or amended by the party for which such representative is acting.  AT&T will not accept any notice or orders from any End User or other agent of Customer.

**Section 5.**  **Equipment.**

    **5.1**  **Generally.**  AT&T shall not be responsible to Customer or any End User for the sale, provision, installation, operation, quality of transmission, or testing and maintenance of any Equipment. Customer is responsible for ensuring that all Equipment meets (i) industry standards for compatibility with Service, (ii) AT&T's requirements for compatibility with Service (provided AT&T notifies Customer), and (iii) all FCC and other applicable regulatory authority requirements.  AT&T is not obligated to activate a Number to any Device that operates on a different radio frequency than AT&T's Service, or otherwise does not meet the applicable standards and requirements.  If any Device fails to meet such requirements, Customer shall use its best efforts to ensure that such Device is no longer used and shall, if necessary, terminate Service to such agent or End User.  Customer shall pay any charges, including additional roaming charges, incurred by AT&T because a Device does not meet AT&T's requirements.

    **5.2**  **Sale of Devices by AT&T.**  AT&T is under no obligation to sell Devices to Customer.  However, AT&T may limit the types of Devices used on the Network to those which happen to be available only through AT&T.  If AT&T chooses to sell a Device to Customer, then (i) AT&T shall disclose the terms and conditions to Customer prior to the sale; and (ii) AT&T retains sole discretion to withhold other approved Devices from sale to Customer.

    **5.3**  **Trans-shipped Devices.**  Customer and its agents shall not activate any Device they have reason to believe was sold by AT&T to one of AT&T's dealers or retailers.  These sales are made on the condition that the Devices will not be trans-shipped (i.e. re-sold to third-party retailers or wholesalers).

**Section 6.**  **Rates.**

    **6.1**  **Generally.** Customer will pay for Service at the rates set forth in the Service Plan(s) Customer selects.  The Service Plans available to Customer are specifically described or referred to in the attached exhibit(s).  AT&T's billing records and those of AT&T's authorized billing agent shall be the sole records used to determine what Service was rendered, and shall prevail over any records maintained by other third parties.

    **6.2**  **Availability of Other Service Plans.**  Customer has the obligation to notify AT&T in writing if Customer believes it is entitled to rates which are, on average, better than the rates AT&T has offered to Customer.  If Customer was entitled to the lower rates, Customer's sole remedy shall be the issuance of a credit to Customer's account for the amount of actual charges Customer would have saved had the lower rates been made available.  The period for determining the savings shall begin 90 days prior to the date of Customer's notice and end on the date the savings are no longer available.

    **6.3**  **Modification of Rates.**

8

**6.3.1   By Customer.**   Customer may change to another available Service Plan at any time provided it pays any applicable early cancellation or change fee.  The change will normally be made within four (4) business hours of AT&T receipt of the request from Customer. Depending on the nature of the change, the effective date for the change may relate back to the first day of the then-current billing cycle.

**6.3.2   By AT&T.**   AT&T may modify a Service Plan at any time in accordance with Section 6.4 below, provided that any modification not adverse to Customer may be made effective upon notice and will not give Customer the right to terminate this Agreement.

**6.4   Prorations.**   Access fees (if any) with respect to assigned Numbers for billing periods of less than one month will be prorated based on the actual number of days in such periods.  For purposes of such prorations, each monthly billing cycle may be deemed, at AT&T's discretion, to have thirty (30) days.  AT&T may, at its option, prorate other monthly charges, such as for calling features.

**6.5   Taxes.**   Customer will pay all applicable federal, state and local sales, use, public utilities, gross receipts or other taxes, fees, or recoveries imposed on AT&T as a result of this Agreement (collectively, "Taxes") (other than taxes imposed on the net income of AT&T). Customer will submit certificates of resale for federal excise tax and as required for the states in which it will resell Service.  Customer is responsible for collecting from its End Users and paying all Taxes associated with its provision of Service and the Application.  Customer will reimburse AT&T for any such Taxes paid by AT&T on Customer's behalf.

**6.6   Tariffs.**   If the Service becomes subject to any federal, state, or local regulation or tariff, then this Agreement shall be deemed amended immediately to conform to the requirements of such regulation or tariff, provided that any tariff changes initiated by AT&T shall still comply with notice provisions under this Agreement.  Nothing in this Agreement shall be deemed (i) to require or preclude the use of tariff-equivalent or tariff-related charges, or (ii) to provide or imply that such charges are or are not appropriate in the provision of Service.

**6.7   Special Offers.**   Unless specified in the Service Plan or in a separate notice from AT&T to Customer, Customer will not be entitled to participate in any marketing promotions, reward programs, retention programs, equipment offers, warranty and insurance packages, "*" and "#" numbers, or other promotions and enhancements provided to other Subscribers (collectively, "Special Offers").  However, if the Network does not prevent access to a Special Offer by End Users, Customer may not encourage the use of the Special Offer by End Users and AT&T may impose a reasonable charge on Customer if such usage occurs.

**6.8   Service Outages.**   In the event of a total Service outage within an Area which is not caused by Customer or its End User and which lasts for a period of twenty-four (24) hours or more, a credit allowance will be made at Customer's request in the form of a pro rata adjustment of the fixed charges billed by AT&T to Customer with respect to such Number.  Periods of discontinuous outage may not be accumulated in determining if an outage has continued for at least twenty-four (24) hours.  In order to receive such credit, Customer must submit a written

9

rev. 1/1/02                         CONFIDENTIAL

05/18/2005  15:56      8456386406                    LAWOFFICES                                    PAGE  11/24

request to AT&T, stating the date and location of the outage, the Numbers affected, and such other information as AT&T may reasonably require. Such notice must be received by AT&T within ten (10) business days following the last date of the period of outage. EXCEPT AS PROVIDED HEREIN, AT&T SHALL INCUR NO LIABILITY FOR SERVICE OUTAGES.

**Section 7.      Invoices, Payments, Disputed Charges and Security Deposits.**

    **7.1      Invoices.** AT&T will provide Customer written invoices for each Number on a monthly basis, normally within ten (10) days after the cut-off date for each billing cycle. Customer must notify AT&T if Customer has not received an invoice within twenty (20) days after the bill cycle cut-off date. AT&T will use reasonable efforts to have all Numbers of Customer in a particular billing database assigned to a single cycle, but any Number may be assigned to any cycle and the cycle to which a Number is assigned may be changed from time to time; provided, however, that AT&T shall not unreasonably require multiple billing cycles for the same billing database. When practicable, AT&T will provide Customer with forty-five (45) days' prior written notice of any change in billing cycles to be used with respect to Numbers assigned to Customer.

    **7.2      Payments.** Payment in full for each invoice shall be due at the location set forth in the invoice, in a form payable in U.S. currency, upon the due date set forth in the invoice. Depending on Customer's payment history, AT&T may at its sole discretion require payment by certified check, money order, or wire transfer, if available. Payments are past due, and Customer shall have committed an Event of Default, if not received by the due date shown on the invoice, or within thirty (30) days after the billing data was received under Section 8, whichever is later. Time is of the essence with respect to payment of AT&T's invoices. If a payment becomes past due, the account will accrue late fees and interest at the rate of one and one-half percent (1.5%) per month or the maximum lawful rate, whichever is less. Customer agrees not to place any condition or restrictive legend, such as "Paid in Full", on any check or financial instrument used to make a payment. The parties agree that the negotiation of any such check or instrument so inscribed shall not constitute an accord and satisfaction or novation.

    **7.3      Disputed Charges.** Customer shall provide AT&T with written notice of any disputed charges within ninety (90) days after the date Customer received the billing data under Section 8, provided Customer shall in all events make reasonable good faith efforts to give AT&T notice of such disputed charges no more than three (3) business days after learning of the disputed charge. Customer shall be entitled to receive the requested credits unless AT&T investigates the claim and notifies Customer of any defenses within 90 days of the initial notice. If AT&T provides such notice of defenses, the parties will use their best efforts to arrive at a mutually agreeable resolution of the appropriate amount due. The parties agree to resolve any disputes remaining after these efforts under the alternative dispute resolution processes described in Article XV below. The notice requirements in this paragraph shall not shorten the period within which actions must be filed as established by the applicable statute of limitations, but shall constitute a condition precedent to any right of the aggrieved party to contest prior invoices or payments. This condition is designed to allow each party the opportunity to preserve important evidence in defense of a claim.

10

rev. 1/1/02                                    CONFIDENTIAL

7.4    **Security Deposits.**  Upon an Event of Default or prior to any assignment of new Numbers, AT&T may require a cash security deposit to secure performance of Customer's obligations under this Agreement.  The security deposit shall be based on AT&T's assessment of Customer's creditworthiness, including Customer's payment history with AT&T, and AT&T may increase or decrease the deposit amount at any time based on a reassessment of those factors.  All decisions with respect to the necessity for and amount of a deposit shall be made in AT&T's sole reasonable discretion.  Customer shall provide the deposit within ten (10) days of AT&T's request.  Failure by Customer to provide the deposit within the ten-day period shall constitute a material breach under this Agreement.  Anytime Customer has a past due balance with AT&T under this Agreement, AT&T may, without further notice or proceedings, deduct any amounts due from the security deposit and pursue other actions as AT&T may deem appropriate.  At termination of this Agreement, upon Customer's full performance of all terms and conditions of this Agreement, any deposit shall be returned, without interest, within ten (10) business days.

In lieu of a cash deposit, Customer may provide a letter of credit issued by a financial institution and having terms and conditions satisfactory to AT&T.  A financial institution will generally be satisfactory to AT&T if it is a bank chartered under the laws of the State of an Area in which Customer purchases Service or the United States with deposits insured by the Federal Deposit Insurance Corporation ("FDIC") and with an office located within the Area.  If Customer fails to pay any sum owed to AT&T, AT&T may draw from the letter of credit and apply such drawings to sums due hereunder.  This right is in addition to all other rights and remedies available to AT&T under this Agreement or at law or in equity.

If Customer files for bankruptcy protection or an involuntary bankruptcy petition is filed against Customer, AT&T and Customer agree that AT&T shall be entitled to draw down against the deposit or letter of credit any sums that are owed AT&T at that time.  Should AT&T seek relief from the automatic stay in order to effect such action, although such relief may not be required under current law, Customer agrees and stipulates to the entry of relief from the stay and agrees to raise no defenses thereto.  AT&T and Customer stipulate that the letter of credit and the Customer's obligations under this Agreement arise out of the same transaction.

**Section 8.    Billing Data.**

8.1    **Availability.**  AT&T will use reasonable efforts to provide electronic or magnetic detailed billing data for all Service Plans loaded into a reseller billing cycle.  All Service Plans specifically identified in the Exhibits to this Agreement will be loaded into such cycles.  Subject to the provisions of Section 18.2 below, it is AT&T's sole determination what other Service Plans are loaded into those billing cycles.

8.2    **Delivery.**    Where billing data is available for a Service Plan, AT&T shall use reasonable efforts to provide Customer with the detailed billing data described in Section 8.1 within seven (7) business days after the billing cycle cut-off date.  AT&T shall provide one set of data per billing cycle.  Customer understands that AT&T may in its discretion assign Customer's Numbers to multiple billing cycle databases.  Customer must notify AT&T of the name, address, and phone number of Customer's billing agent at least forty-five (45) calendar days prior to the

11

rev. 1/1/02                         CONFIDENTIAL

expected mailing date of the billing data.  Each package delivered to Customer's billing agent shall be labeled according to the then current procedures of AT&T's billing vendor.  Customer must notify AT&T immediately if it does not receive billing data within the seven (7) business day time frame.  The media provided by AT&T will include reasonable billing information compiled using standard industry protocols.  Customer agrees to notify AT&T within three (3) business days after receiving such media of any flaws or defects, and to return the defective media to AT&T's billing vendor.  Customer shall pay AT&T's cost for any unreturned defective bill media.

8.5      **Audits.**  Customer may request an audit to determine the accuracy of any invoice rendered within 90 days of the request.  The parties shall provide access to such necessary and reasonably required data to facilitate the audit.  Customer shall pay the actual fees incurred as a result of the audit unless the audit reduces the charges by more than two percent (2%).  If the audit reduces the charges by more than two percent (2%), then AT&T will reimburse Customer for all fees and costs of such audit in addition to reducing the amount owed.

**Section 9.**      Abusive or Fraudulent Use.

9.1      **Generally.**  Service to a Number may be restricted or cancelled if there is a reasonable suspicion of abuse or fraudulent use.  AT&T shall provide prompt notice of the restriction or termination to Customer.  Customer agrees to make good faith efforts to minimize abuse or fraudulent use, to promptly report to AT&T any such abuse or fraudulent use of which Customer becomes aware, and to cooperate in any investigation or prosecution initiated by AT&T.  Abuse and fraudulent use of Service include, but are not limited to:

(i)      Attempting or assisting another to access, alter, or interfere with the communications of and/or information about another wireless customer;

(ii)     Tampering with or making an unauthorized connection to the Network;

(iii)    Installing any amplifiers, enhancers, repeaters, or other devices that modify the radio frequencies used to provide the Service;

(iii)    Subscription Fraud;

(iv)     Using Service in such a manner so as to interfere unreasonably with the use of Service by one or more other wireless customers or End Users or to interfere unreasonably with AT&T's ability to provide Service;

(v)      Using Service to convey obscene, salacious, or unlawful information;

(vi)     Using Service without permission on a stolen or lost Device;

(vi)     Unauthorized Access.

12

rev. 1/1/03

CONFIDENTIAL

**9.2    Liability for Abuse or Fraudulent Usage.** Liability for charges and other costs or damages resulting from abuse or fraudulent use shall be as follows:

**9.2.1** Customer shall have sole liability for charges, costs or damages resulting from (i) Subscription Fraud, (ii) any theft of a Device, a User ID number, or password associated with the Service; (iii) any abuse or fraud facilitated by Customer, Customer's employees. Customer's agents or End Users. or (iv) any failure to give prompt notice of suspected abuse or fraudulent use based on information available to Customer.

**9.3.** Customer shall have no liability for abuse or fraudulent use charges, costs or damages incurred after AT&T has discovered the abuse or fraud or four (4) business hours after Customer has notified AT&T of it.

**9.2.4** Customer shall not be liable for any charges relating to Unauthorized Access if Customer provides AT&T with clear and convincing evidence of the Unauthorized Access, such as: (i) call detail information for the End User's account; and (ii) a statement by Customer that it has thoroughly investigated the alleged Unauthorized Access and that it will cooperate reasonably in obtaining affidavits or other required documentation required for any prosecution of the person fraudulently using the Service. AT&T reserves the right to modify this provision to require affidavits prior to issuing any credits if Customer does not comply with this Section. Such investigation by Customer should include contacting or attempting to contact a sufficient number of recipients of calls at issue of each End User so as to establish a reasonable basis for inferring that the remainder of such calls were the result of Unauthorized Access.

**Section 10.    Confidentiality.**

**10.1    Non-Disclosure of Confidential Information.** Either party may (but shall not be obligated to) disclose information to the other party which the disclosing party considers proprietary or confidential. Without the disclosing party's specific prior written consent. disclosure shall not be made to a third party (including but not limited to End Users) of any information which is designated confidential or proprietary and which is supplied by one party to the other party: and which information is not otherwise generally available to the public or is not already known to the other party: provided, however, either party may disclose such information in compliance with court processes or similar agency requirements if the other party has been given ten (10) days prior notice of the proposed disclosure or as much notice as is reasonably possible if the situation does not permit such ten (10) day notice. The parties agree that equitable relief is available for any breach or threatened breach of this Section 17.

**10.2    Additional Protection of Confidential Information.** In the performance of this Agreement. AT&T's Affiliates, officers, directors. agents and employees may come into possession of information about Customer's End Users. including but not limited to Numbers and usage or other forms of identification of End Users. Neither AT&T nor any person or entity obtaining such information by or through AT&T may use any such information except as required to provide Service to Customer under this Agreement. However, any information

13

independently developed by AT&T which includes End User data may be used by AT&T at its sole discretion. Such information shall be treated by AT&T as confidential hereunder.

## Section 11.   Marks.

**11.1   AT&T Marks.**  Customer recognizes the right, title and interest of AT&T and its respective Affiliates in and to all service marks, trademarks and trade names used by any of them in connection with the Service (the "AT&T Marks"). Customer agrees not to engage in any activities or commit any acts, directly or indirectly, which may contest, dispute, or otherwise impair such right, title, and interest of AT&T and its respective Affiliates therein. Customer will not gain any rights to the AT&T Marks by virtue of this Agreement and will not use any AT&T Marks without AT&T's prior written consent.

**11.2   Customer Marks.**  AT&T recognizes the right, title and interest of Customer and its respective Affiliates in and to all service marks, trademarks and trade names used by any of them in connection with the Service (the "Customer Marks"). AT&T agrees not to engage in any activities or commit any acts, directly or indirectly, which may contest, dispute, or otherwise impair such right, title, and interest of Customer and its respective Affiliates therein. AT&T will not gain any rights to the Customer Marks by virtue of this Agreement and will not use any Customer Marks without Customer's prior written consent.

**11.3   Protection of Marks.**  Neither party will engage in any activity that may be harmful to the other party's goodwill or may reflect unfavorably on its marks. This prohibition includes, without limitation, the commission of any unfair trade practice, the publication of any false, misleading or deceptive advertising, or the commission of any fraud or misrepresentation.

## Section 12.   Indemnification and Insurance.

**12.1   Indemnity.**  Customer and AT&T each hereby agree to defend, indemnify and hold harmless each other and each other's Affiliates, and their former, current, and future officers, directors, employees, agents, successors and assigns, from and against any claims, costs and expenses, including punitive damages, court costs, and reasonable attorneys' and expert witness' fees before and at trial and on appeal (collectively, "Claims"), arising from a breach of this Agreement by or any conduct in connection with this Agreement by the indemnifying party (including such party's Affiliates, and their officers, directors, employees, agents, and contractors). Customer further agrees to defend, indemnify, and hold harmless AT&T, its Affiliates, and their former, current, and future officers, directors, employees, agents, successors, and assigns, from and against any Claims of End Users. Notwithstanding the foregoing, the obligations of both Customer and AT&T to defend, indemnify, and hold harmless shall not apply to the extent such claims result from the other party's negligence or willful misconduct.

Within ten (10) days after being notified of any Claim to which these indemnification obligations may apply, the party receiving such notice shall notify the party from whom the indemnification is sought (the "Indemnifying Party"), and shall give reasonable opportunity to the Indemnifying Party to defend the claim at its own expense and with counsel of its own

14

rev. 1/1/02

CONFIDENTIAL

selection; provided, however, that the party seeking indemnification shall at all times have the right to participate fully, at its own expense, in the defense of and to approve any settlement of the Claim.

If the Indemnifying Party, within thirty (30) days after notice, shall fail to accept defense of the Claim, then the party seeking indemnification shall have the right, but not the obligation, to undertake the defense of, and to, compromise or settle (exercising reasonable business judgment), the Claim on behalf, for the account, and at the risk of the Indemnifying Party. If the Claim cannot by its nature be defended solely by one party, the other party shall make available all information and assistance that may reasonably be requested, regardless of any obligations to indemnify hereunder.

12.2   Insurance.   Customer shall keep in full force and effect a policy of public liability, personal injury, property damage, and contractual liability insurance with respect to the business operated by Customer, which insurance shall cover each occurrence in an amount not less than $1,000,000 and shall cover property damage in an amount not less than $500,000.00. Such policy or policies shall name AT&T as an additional insured and shall be procured from an insurance carrier reasonably acceptable to AT&T.  Upon request, Customer shall furnish AT&T with a certificate evidencing such insurance.  Such insurance shall provide that the insurer will not cancel, materially alter, or allow such insurance to expire without first giving AT&T thirty (30) days' notice.

## Section 13.   No Warranties.

AT&T SUPPLIES A SERVICE, AND NOT GOODS.  AT&T MAKES NO WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE SERVICE OR THE PERFORMANCE OF ANY OBLIGATIONS HEREUNDER INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  ALL SUCH WARRANTIES ARE EXPRESSLY EXCLUDED.  AT&T IS NOT THE MANUFACTURER OF ANY CUSTOMER EQUIPMENT AND MAKES NO WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT THERETO.   TO THE EXTENT AT&T PROVIDES ACCESS TO INFORMATION PROVIDED BY OTHER SOURCES, AT&T ACCEPTS NO LIABILITY FOR AND MAKES NO WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE CONTENT THEREOF. CUSTOMER HAS NOT RELIED ON AND WILL NOT CLAIM THAT IT IS ENTITLED TO THE BENEFITS OF ANY REPRESENTATIONS, PROMISES, DESCRIPTION OF SERVICES OR OTHER STATEMENT NOT SPECIFICALLY SET FORTH IN THIS AGREEMENT.

## Section 14.   Limitation of Liability.

14.1   NO CONSEQUENTIAL DAMAGES.  NEITHER PARTY WILL BE LIABLE TO THE OTHER (OR ITS END USERS, CUSTOMERS OR ANY THIRD PARTY) FOR ANY INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF SUCH PARTY'S FAILURE TO PERFORM UNDER THIS AGREEMENT.  NOTHING IN THIS

15

rev. 16/02                                 CONFIDENTIAL

SECTION 14 WILL LIMIT A PARTY'S OBLIGATION TO FULLY INDEMNIFY THE OTHER UNDER SECTION 12 FOR ACTIONS BROUGHT BY THE INDEMNIFYING PARTY'S CUSTOMERS, END USERS OR BY ANY THIRD-PARTY, EVEN IF SUCH ACTIONS INCLUDE CLAIMS FOR INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES.

14.2    LIABILITY CAP.  EXCEPT FOR LIABILITIES ARISING UNDER SECTION 9, THE AGGREGATE LIABILITY OF AT&T FOR CLAIMS RELATING TO THIS AGREEMENT, WHETHER FOR BREACH OR IN TORT, WITH RESPECT TO CUSTOMER, END USERS, OR OTHER USERS OF SERVICE OR FACILITIES, WILL NOT EXCEED THE AMOUNT PAID BY CUSTOMER TO AT&T IN THE TWO (2) MONTH PERIOD PRECEDING THE DATE THE CLAIM AROSE.

14.4    PARTY.  FOR THE PURPOSES OF THIS SECTION 14, "PARTY" MEANS THE PARTY, ITS SUBSIDIARIES AND AFFILIATES AND THEIR RESPECTIVE OWNERS DIRECTORS,   OFFICERS,   EMPLOYEES,   AGENTS,   REPRESENTATIVES, SUBCONTRACTORS AND SUPPLIERS.

Section 15.    Default and Termination

15.1    Default.  This Agreement may be terminated by either party if an Event of Default is not cured by the defaulting party within thirty (30) days of receipt of notice of the Default: provided, however, that in the case of failure to pay invoices in accordance with Section 7 or in the case of a violation of Section 9, 10 or 11, this Agreement may be terminated if such Event of Default is not cured within ten (10) days of receipt of notice of the Default.

15.2    Continuation of Service to End Users.  AT&T shall have no obligation to provide Service to Customer upon termination of this Agreement.  However, in order to avoid disruption of Service to End Users, AT&T may continue Service directly to any End User who meets AT&T's credit requirements, and enters into a contract for Service with AT&T.  From and after the termination date, AT&T may re-route calls using any Numbers previously assigned to Customer so that any attempt to access Service will result in connection to AT&T's personnel, who will advise callers of the termination.  Notwithstanding anything in this Agreement to the contrary, but provided that AT&T has met all its obligations hereunder, AT&T is not restricted in any way from providing Service directly to any End User who may request that AT&T do so.

15.3    Survival of Obligations.  Upon termination of this Agreement for any reason, all amounts owing to AT&T hereunder will become due and payable.  Any part of this Agreement that may reasonably be interpreted or construed as surviving termination or which may be necessary or convenient for a party to effectively enforce the terms of this Agreement will survive the termination of this Agreement, including without limitation Sections 10 through 18.

15.4    Cumulative Remedies.  Termination of this Agreement, regardless of cause or nature, shall be without prejudice to any other rights or remedies of the parties.  Termination of this Agreement with or without cause shall not release either party from any liability which has

**18.8   Entire Agreement.**  This Agreement, which includes any specifically identified exhibits, sets forth the entire agreement between the parties concerning the subject matter hereof.

**18.9   Amendments.**  Except where a different time period is specifically stated in this Agreement, AT&T may amend this Agreement upon ninety (90) days' notice to Customer.  If AT&T notifies Customer of an amendment to this Agreement and such amendment is unacceptable to Customer, then Customer has the right to terminate this Agreement upon thirty days' notice given anytime prior to the effective date of the amendment.  Customer has no unilateral right to amend this Agreement.

**18.10   Construction of Terms.**  This Agreement shall not be construed more strongly against any party, regardless of who is responsible for its preparation or drafting.

**18.11   Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall constitute an original agreement, but all of which together shall constitute one and the same instrument.

**Section 19.   Independent Investigation**

AT&T and Customer acknowledge they have read this Agreement and understand and accept all terms, conditions, and covenants.  Customer acknowledges and understands that AT&T may at any time also be engaged directly or indirectly through other resellers and through dealers or outlets of any kind, in soliciting potential Subscribers for the Service or other services or products.  Customer acknowledges that it understands that it will not obtain any exclusive rights under this Agreement, either with respect to a territory or otherwise.  Customer also acknowledges and understands that AT&T may sell the Service to others who may resell it.  Customer has independently investigated the business of providing wireless service and the profitability (if any) and risks thereof and is not relying on any representation, guarantee, or statement of AT&T other than as set forth in this Agreement.

Customer also acknowledges that AT&T does not represent:  (i) the amount of profits, net or gross, that Customer can expect from its operations under this Agreement or that Customer will derive income from the sale of AT&T's services under this Agreement; (ii) that AT&T will refund any payments made by Customer to AT&T under this Agreement except as otherwise provided herein; or (iii) that AT&T will provide a sales or marketing program that will enable Customer to derive income under this agreement.

Customer further acknowledges that, except as specifically set forth in this Agreement, AT&T does not make any representations regarding:  (i) the quantity or quality of Service to be sold by Customer; (ii) the provision by AT&T to Customer of training and management assistance; (iii) the size (other than the geographic area), choice, potential, or demographic nature of an Area or the number of other dealers or reselling customers that are or may in the future operate in that Area; (iv) the termination, transfer, or renewal provisions of this Agreement other than as set forth in the Agreement; or (v) the sponsorship or participation of a primary marketer

20

rev. 1/1/02

CONFIDENTIAL

of trademark products or services in Customer's operations under this Agreement other than as may be set forth in this Agreement.

AT&T acknowledges that Customer may at any time solicit potential customers for wireless service provided by Customer directly or indirectly through business relationships with entities competing with AT&T.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers as of the day and year first above written.

Customer: _____        AT&T Wireless Services, Inc.

By: _____         By: _____

Its: _____        Its: _____

Date: _____         Date: _____

21

# EXHIBIT C

05/18/2005  15:56    8456386406                    LAWOFFICES                        PAGE  21/24
FEB-12-2005 02:16  FROM:                                                    TO:8306426          P:42:7

February 2, 2005

**Via Facsimile and Overnight Mail**

CellCom Tech
Zalman Silber
276 South Grandview Avenue
Monsey NY 10952

Re:    *Payment Plan*

Dear Mr. Zalman Silber:

New Cingular Wireless Services, Inc., formerly known as AT&T Wireless Services, Inc. ("Cingular"), and CellCom Tech, Inc. ("CellCom Tech") have entered into a Reseller Agreement dated February 26, 2003 for resale of Cingular's wireless service by CellCom Tech.  CellCom Tech is past due in payment for services rendered by Cingular pursuant to the Reseller Agreement. In consideration for Cingular not terminating the Reseller Agreement, CellCom Tech agrees to the terms of this Letter Agreement and the payment schedule set forth herein. Notwithstanding the foregoing, the parties agree that Cingular does not waive nor relinquish any right or remedy under the Reseller Agreement by entering into this Letter Agreement.

The parties have agreed to the payment terms attached hereto and incorporated herein by reference as *Exhibit A* ("Payment Plan"). This Letter Agreement is governed by the terms and conditions of the Reseller Agreement. Notwithstanding the foregoing, as it relates to the Payment Plan, the specific terms of this Letter Agreement replace and supersede any conflicting terms in the Reseller Agreement. If CellCom Tech fails to adhere to the terms of this Letter Agreement, the payment schedule contained in *Exhibit A*, or the Reseller Agreements, then Cingular shall provide CellCom Tech written notice of such default. Such notice shall be deemed delivered at the time it is sent via overnight mail and facsimile to Zalman Silber at (845) 426-3223. Upon such notice, CellCom Tech shall have forty-eight (48) hours to cure such default. If CellCom Tech fails to cure any such default within this forty-eight (48) hour period, then failure to cure will result in the immediate termination of this Letter Agreement and the Reseller Agreement without any further action required by Cingular. Furthermore, if (1) CellCom Tech fails to adhere to the terms of the Letter Agreement and/or the Reseller Agreement, (2) Cingular provides CellCom Tech notice of default and (3) CellCom Tech cures its default after such notice, then after the third time that CellCom Tech fails to adhere to the terms of the Letter Agreement and/or the Reseller Agreements, Cingular is entitled to deem the Letter Agreement and the Reseller Agreement terminated even if CellCom Tech cures such default.

Upon such termination, Cingular shall have the right, to assert any and all remedies set forth in the Reseller Agreement. Additionally, the parties agree that Cingular may immediately contact CellCom Tech end users by any means it selects in order to inform them how they may maintain service with Cingular if they so desire.

To prevent the termination, all payments must be delivered to the attention of:

Cingular Wireless
ATTN: Resale Payments
4513 Western Ave.
Lisle, IL 60532

1 of 3

05/18/2005  15:56    8456386406                    LAWOFFICES                              PAGE  22/24
FEB-12-2000 02:11  FROM:                                           TO:6386406                        P:5-7

Please be advised that any partial payments received by Cingular or Cingular's willingness to discuss CellCom Tech's failure to make any payments are not, and shall not be deemed to be a modification of the Letter Agreement or the Reseller Agreement, a waiver, postponement or release of the failure to pay or the default, or a waiver of Cingular's rights and remedies against CellCom Tech, or any property securing the transaction contemplated by the Reseller Agreement, all of which rights and remedies are expressly reserved. This Letter Agreement shall terminate upon Cingular's receipt of all payments set forth herein, and upon CellCom Tech achieving a current payment status as determined by Cingular in its sole discretion.

This Letter Agreement may be modified only in writing signed by the undersigned. All communications concerning this matter should be directed solely to Ric Murray at (404) 236-6383.

By signing below you are agreeing to be bound by the terms and conditions of this Letter Agreement.

Very truly yours,

Ric Murray
Vice President – Resale Operations

Agreed to this _____ day of _____, 2005, by _____, as authorized representatives on behalf of CellCom Tech, Inc.

Signature _____              Signature _____

Zalman Silber                                    Hay Abockaser
Printed Name                                     Printed Name

Title _____                   Title _____


Agreed to this _____ day of _____, 2005, by New Cingular Wireless Services, Inc., formerly known as AT&T Wireless Services, Inc.

Signature _____

Printed Name _____

Title _____

2 of 3

## Exhibit A

- **Payment Plan**

CellCom Tech shall make payments ("Payment(s)") no later than 4:00 p.m. Eastern Time per the schedule contained below, to be applied toward its past due invoices. Cingular has detailed the schedule of payments, for the months of March 2005 through October 2005 below.  Cingular shows an outstanding past due balance through December 2004 billing of $ 524,115.60.

Additionally, CellCom Tech agrees to the following payment terms:

- CellCom Tech will pay $100,000 no later than February 2, 2005 to be applied towards the past due balances.
- CellCom Tech will pay the January 2005 invoice on a Net 45 payment term
- CellCom Tech will make payments on a Net 30 term beginning with the February 2005 invoice.
- CellCom Tech will make monthly payments for the remaining past due balance of 424,115.60 as indicated below:

| DATE | AMOUNT(S) DUE - For past due invoicing | COMMENTS |
|---|---|---|
| 03/15/2005 | $53,014.45 | To be received no later than 4:00 PM EST |
| 04/15/2005 | $53,014.45 | To be received no later than 4:00 PM EST |
| 05/15/2005 | $53,014.45 | To be received no later than 4:00 PM EST |
| 06/15/2005 | $53,014.45 | To be received no later than 4:00 PM EST |
| 07/15/2005 | $53,014.45 | To be received no later than 4:00 PM EST |
| 08/15/2005 | $53,014.45 | To be received no later than 4:00 PM EST |
| 09/15/2005 | $53,014.45 | To be received no later than 4:00 PM EST |
| 10/15/2005 | $53,014.45 | To be received no later than 4:00 PM EST |

3 of 3